# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### July 16, 2002 Session

## STATE OF TENNESSEE v. RANDY RAY AND BOBBY PRYOR

**Direct Appeal from the Circuit Court for Marion County**
**No. 5137A, 5137B     Thomas W. Graham, Judge**

---

**No. M2001-01532-CCA-R3-CD - Filed January 6, 2003**

---

The defendants, Bobby Pryor and his son-in-law, Randy Ray, were indicted by a Marion County Grand Jury for one count of aggravated assault and one count of vandalism over $1000 based on a November 8, 1999, altercation with the victim, Randy Hutchins. A third count of the indictment charged Pryor with another aggravated assault against the same victim, based on a separate incident on November 8, 1999, in which Ray was not involved. At the conclusion of the defendants' joint trial, Pryor was found guilty of assault, a Class A misdemeanor, in count one; vandalism over $1000, a Class D felony, in count two; and reckless endangerment with a deadly weapon, a Class E felony, in count three. Ray was found guilty of reckless endangerment with a deadly weapon, a Class E felony, in count one; and vandalism of $500 or less, a Class A misdemeanor, in count two. Following the denial of their motions for new trial, both defendants filed timely appeals to this court. However, during the pendency of the appeal, Pryor's counsel filed a suggestion of Pryor's death, followed by a copy of his death certificate. Consequently, on May 1, 2002, this court entered an order declaring that the criminal proceedings against Pryor were abated by his death, leaving only Ray's appeal to continue. Ray raises four issues for our review: (1) whether he was denied a fair trial by the victim's allegedly having tampered with the jury; (2) whether he was denied his right to an impartial trial judge; (3) whether the evidence was sufficient to support his conviction for vandalism; and (4) whether count one of the indictment was fatally defective. Based on our review of the record and of applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Philip A. Condra, District Public Defender, for the appellant, Randy Ray.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; James Michael Taylor, District Attorney General; and Will Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

# FACTS

The defendants were tried jointly before a Marion County Circuit Court jury from August 15-16, 2000. The State's first witness was the victim, Randy Hutchins, who testified that at the time the events in this case took place, he lived in a travel trailer on Hicks Holler Road, approximately 200 yards from Bobby Pryor, who lived in a house on the other side of the road. Pryor also owned a trailer park, consisting of three or four trailers, located across from the victim's trailer on Hicks Holler Road, and on the other side of a small road that ran beside Pryor's house, apparently perpendicular to Hicks Holler Road. According to the victim's testimony, early on the morning of November 8, 1999, he drove his 1976 Chevrolet Blazer across the road to one of the trailers in Pryor's trailer park, which was being leased by a man for whom the victim occasionally worked. The victim testified that he got out of his vehicle, walked to the trailer's door, and knocked. As the victim was standing at the door, Pryor came out of his house with a baseball bat, ran across the road beside his house over to the victim, and said, "[Y]ou'd better have your gun because I'm going to kill you." The victim testified he told Pryor that he did not want any trouble and would leave, but Pryor said no, he was going to kill him.[1] The victim got back inside his vehicle and began backing out of the driveway, while Pryor began beating all over the vehicle with the baseball bat, hitting the hood repeatedly and beating the windows out of the vehicle. The victim said that Ray was standing on Pryor's porch during the incident, but he did not participate. After leaving the trailer park, the victim drove to a motel down the street, where he telephoned the sheriff's department to report the incident. He then drove to the county courthouse to obtain a warrant.

The victim testified that the second incident occurred at about 1:30 p.m. that same day, as he was visiting a woman who lived on Highway 41, which is intersected by Hicks Holler Road. He said he was standing outside talking to the woman when he saw Pryor come out of Hicks Holler Road in his pickup truck, "burning the tires," with Ray in the vehicle beside him. At sight of the defendants, the victim ran for his Blazer, making it inside just as the defendants pulled in. According to the victim, Pryor drove his truck into the side of the Blazer, knocking the victim sideways off his seat. Both defendants then jumped out of the truck and began beating the Blazer all over, with Pryor once again using a baseball bat. The victim testified that he was lying on the floorboard kicking his feet up and trying to get the Blazer started when Ray reached in the open window and took his six-shot .22 caliber revolver off his dashboard. The victim explained that he had retrieved the gun from his house after the morning incident because he feared for his life. He said that after getting the Blazer started, he reached up, put it in reverse, and then pressed down on

---

[1]The victim testified on direct examination that there were ill feelings between himself and Pryor before the date the events in this case transpired, but he did not know the reason for the ill will. On cross-examination, however, he acknowledged having had earlier confrontations with Pryor over whether Pryor had the right to prevent him from entering the trailer park. The victim denied that the reason Pryor ordered him to stay away was because he believed the victim to be involved in drug transactions in the park. The victim testified, instead, that Pryor wanted him to stay away because there was "a lot of stuff going on at [Pryor's] house," and Pryor believed the victim to be working as a confidential informant for the police.

the accelerator with his hand. The Blazer went backwards, hit a ditch, and spun around. When the victim raised his head, he saw Ray standing in front of the Blazer with the victim's gun in his hand. The victim testified that the Blazer was still moving backwards, away from the defendants, as Ray fired two shots into the windshield, towards the victim's face. The victim said he then jerked the vehicle into gear and "cut out down the road." As he was driving away, another shot was fired at the back of his vehicle, striking one of the tires. The victim identified photographs showing the damage to his vehicle and estimated that the fair market value of the vehicle before and after the damage was approximately $4500 and $1000, respectively.

The victim testified on cross-examination that Pryor had confronted him a couple of times in the past, ordering him to stay off his property and off the road that ran beside his house. The victim believed, however, that Pryor had no right to prevent him from using the county road, or from visiting at a trailer he had leased to someone else. He said that Pryor beat his Blazer with a ball bat during one of those previous encounters, putting a dent in the back of the vehicle. The victim testified he took the bat away from Pryor and did not report the incident to the police. He denied that he swung the bat at Pryor or pointed a gun at him, although he admitted that he probably had his gun in the console of his Blazer at that time.

The victim was positive that he did not pull his gun on either defendant on November 8, 1999. He testified that his gun was lying in the left corner of his dashboard, behind some tools and down in a hole. He said that Ray was beating at his vehicle with a short club when he reached inside and took the gun from the dashboard. Upon further cross-examination, the victim testified that Ray was trying to beat him, inside the vehicle, when he reached and took the gun. The victim also testified, for the first time on cross-examination, that the first shot Ray fired struck the floorboard of the vehicle beside where the victim was lying. The victim explained that he had not taken photographs of that bullet hole because he did not think the hole made by his small caliber weapon in the carpet would be detectable in a photograph.

Court Officer Marion Duggan, an employee of the Marion County Sheriff's Department, testified that he was dispatched to Pryor's residence on November 8, 1999, regarding an altercation between Pryor and the victim. Ray was on the front porch when he arrived, and Pryor was inside sitting on a couch. Pryor invited him in and gave him a pistol that was in a plastic sandwich bag, which Duggan took to the jail and turned over to an investigator. At some point, Duggan also saw the victim's vehicle. He testified that he remembered seeing some small holes in the vehicle that might have been caused by a gun but could not remember anything else about the vehicle.

Marion County Sheriff's Department Detective Gene Hargis testified that the victim came to his office on November 8, 1999, to tell him about the afternoon incident and to show him the damage to his vehicle. Detective Hargis's memory was that there were four small holes in the vehicle that appeared to have been made by a small caliber weapon: one in the passenger door, two in the front windshield, and possibly one in the tailgate area. In addition, there were a few slivers of broken glass in the back of the vehicle, and the left rear tire was going flat.

The defendants presented one witness in their defense, Kenneth Baisden, an eyewitness to the afternoon incident, who said he did not know any of the parties involved. Baisden testified he was outside a fish market on Highway 41 at about 1:30 or 2:00 p.m. on November 8, 1999, when he heard loud cursing. When he looked up, he saw a Chevrolet Blazer and a small pickup truck approximately 100 feet from him, at a house across the highway. He next saw the defendants get out of the truck, Pryor approach the victim's door, and the victim point a gun out the window of the Blazer at Pryor's head. Baisden testified that Ray lunged across the hood of the pickup truck, knocked the gun out of the victim's hand, and then bent to pick it up from the ground. He said that at the very instant Ray was reaching down to get the gun, Pryor "was trying to reach through the window to get [the victim]." The victim then took off in the Blazer, spun around, and headed straight back toward the defendants, in an apparent attempt to run them over. At that point, Ray fired what Baisden believed were two shots through the windshield. The victim ducked down, turning the steering wheel and causing the vehicle to swerve from the defendants and go over a ditch. Baisden testified that Ray was still shooting at the victim at that time. He said he did not see anything in Ray's hands when he dived across the hood of Pryor's truck to knock the gun from the victim's hands, and that Ray did not begin shooting until the victim had spun his vehicle around and was driving back toward Ray and Pryor.

On cross-examination, Baisden testified that Ray climbed on the bumper of Pryor's vehicle and lunged across the hood to get to the gun in the victim's hands. When questioned about the practicality of that scenario, Baisden testified, contrary to his direct examination testimony, that Ray was able to reach the victim before the victim had a chance to shoot because the victim had to search his vehicle for the gun while Ray was lunging across the hood. Upon further questioning, Baisden changed his testimony again, stating that he did not see the victim searching for his gun and that everything occurred all at once. He said that the defendants had pulled their vehicle against the victim's vehicle in such a way as to make them "up against him," and he agreed that the victim never got out of the vehicle. On redirect, he testified that the victim was holding his gun only six to eight inches from Pryor's head. Baisden testified on recross-examination that he heard someone yell "son of a bitch, motherfucker, I'm going to kill you, kill you," but he could not determine who said those words.

## ANALYSIS

### I. Alleged Jury Tampering

As his first issue, Ray contends that he was denied a fair trial because the victim tampered with the jury. He asserts that there were three instances in which the victim either had improper contact with jurors or attempted improper contact: (1) when the victim spoke to a juror about the juror's job and a mutual acquaintance; (2) when he asked the court clerk, who was handing out paychecks to jurors, if she had a check for him also; and (3) when he attempted to speak to another juror in the hallway of the courthouse. Ray argues that the victim's conduct created a rebuttable presumption of prejudice, which the State failed to overcome. The State argues that the trial court

correctly found that there was no evidence that the defendants were prejudiced by the victim's conduct and, therefore, did not abuse its discretion in refusing to declare a mistrial.

The jury in this case was not sequestered. The record reflects that after a break in the trial, Ray's counsel informed the trial court that Ray had seen the victim talking to Mr. Lowery, one of the jurors, during the break, and that Ray's wife had told Ray that Mr. Lowery was the third juror to whom the victim had talked. During the jury-out hearing that followed, the victim said that he had asked the clerk, who was giving out checks to the jurors, if she had a check for him, too.[2] He also acknowledged having spoken to Mr. Lowery, telling the trial court that he had asked what he did for a living, and that Mr. Lowery had told him he drove a truck. The victim denied having had any conversation about the case, and claimed not to have realized that the trial court's earlier admonition to the jurors not to talk with anyone included talking with him about matters unrelated to the case.

When Mr. Lowery was questioned in turn, he informed the trial court that he and the victim had "chit chat[ted]" during the break about his work and whether he knew a man named Flynn for whom the victim had once worked, but they had not talked about the case. He estimated that the entire conversation lasted one or two minutes and said that it occurred on the walkway outside the courtroom, within sight of some of the other jurors. He said that the conversation would not influence his decision in the case.

The trial court expressed its belief that the conversation had been innocent, but announced that it would nonetheless remove Mr. Lowery from the jury to avoid any possible taint of the jury verdict. The court overruled the defendants' motion for a mistrial, finding that the defendants were not prejudiced by either the removal of Mr. Lowery from the jury, or the fact that the victim had asked for a paycheck in the presence of the jurors. With regard to the latter instance of alleged jury tampering, the trial court found that the victim's behavior, rather than prejudicing the jury against the defendants, would more likely have the opposite effect of diminishing the victim's credibility. When the remaining jurors were brought back into the courtroom, the trial court first informed them that Mr. Lowery had been removed because of having engaged in conversation with the victim. The court then questioned whether any of the remaining jurors had had any conversation with the victim, including just to say hello or goodbye, and whether they had seen any other jurors talking with him. None of the jurors indicated that they had, and the trial continued with the alternate juror taking Mr. Lowery's place.

No other mention was made during the trial of the victim's having attempted to contact any other jurors. However, during the hearing on the motion for a new trial, Marion County Sheriff's Deputy Mark Gardner testified that he was serving as a court officer during the defendants' trial when he observed the victim attempting to initiate a conversation with one of the male jurors outside the courtroom by asking him if he knew a particular individual. He said that he told the victim to move on, and no communication occurred between the victim and the juror about the case.

---

[2] The clerk confirmed that the victim had asked her for a check in the presence of the jurors.

Gardner's memory was that the contact occurred at some point after Mr. Lowery had already been excused from the jury.

Ray cites State v. Young, 866 S.W.2d 194, 196 (Tenn. Crim. App. 1992), to argue that the victim's contacts with the jurors were sufficient to create a rebuttable presumption of prejudice, which then shifted the burden to the State to show that the contacts and communication were harmless. However, in order to shift the burden to the prosecution to demonstrate the harmlessness of the communication, "the threshold question is whether the statement communicated to the jury was prejudicial to the Defendant." State v. Parchman, 973 S.W.2d 607, 612 (Tenn. Crim. App. 1997). Moreover, when a jury is not sequestered, the defendant has the burden of showing more than mere interaction between jurors and third parties in order to shift the burden to the prosecution to demonstrate that no prejudice to the defendant occurred. State v. Blackwell, 664 S.W.2d 686, 689 (Tenn. 1984); State v. Clinton, 754 S.W.2d 100, 103 (Tenn. Crim. App. 1988). Instead, the defendant must show that some extraneous prejudicial information or improper outside influence was imparted or brought to bear on the jury. Clinton, 754 S.W.2d at 103 (quoting Blackwell, 664 S.W.2d at 689).

The defendants were unable in this case to show that the victim imparted any extraneous prejudicial information to the jurors or exerted any improper influence on them. To the contrary, the record makes it clear that the conversations the victim had with the jurors, regarding work or mutual acquaintances, were in no way directly related to the case. Ray contends that the victim's actions and conversations amounted to an attempt to ingratiate himself with the jurors and thereby influence the outcome of the trial. He argues that the fact that the victim approached other jurors after the trial court specifically instructed him not to have any contact with the jury makes it clear that the victim's conduct was not innocent but, instead, was a deliberate attempt to win favor with the jurors. We disagree that the victim's actions make it clear that he was attempting to win favor with the jurors. Furthermore, even if this was the victim's intention, there is no evidence that he succeeded. We therefore conclude that the trial court did not err in denying the defendants' request for a mistrial, or in denying their motion for a new trial on the grounds of alleged jury tampering.

## II. Trial Court's Alleged Partiality

Ray next contends his due process rights were violated because the trial court exhibited partiality towards the State by, *inter alia*: (1) making comments in the presence of the jury that conveyed the message that defense counsel was acting improperly; (2) instructing the State during a jury-out hearing on how to prove damages; (3) ruling that defense counsel could not cross-examine the victim about his criminal history; and (4) failing to inform the jurors that the victim, as well as Mr. Lowery, had engaged in improper behavior by conversing with each other.

It is axiomatic that a defendant has the right to have a fair and impartial judge preside over his trial. See State v. Brock, 940 S.W.2d 577, 581 (Tenn. Crim. App. 1996). The conduct or action of a trial judge can result in an abridgement of a defendant's right to due process. See State v. Benson, 973 S.W.2d 202, 207 (Tenn. 1998) (defendant alleged that the trial judge had solicited a

bribe from him); State v. Brock, 940 S.W.2d 577, 581 (Tenn. Crim. App. 1996) ("Over the Defendant's objection, the trial judge asked the Defendant the question that placed in the record the only evidence to support the jury's finding of an essential element of the offense."). However, in this case, we find nothing in the record to show that the trial judge was not fair and impartial.

As his first example of alleged partiality, Ray cites comments the trial court made during a portion of the trial in which defense counsel was cross-examining the victim about the warrants he had signed in connection with the case. Ray argues that the trial court's remarks suggested to the jury that defense counsel was somehow behaving improperly. We disagree. The comments occurred as counsel for the codefendant was questioning the victim about inconsistencies between his trial account and his statements in the warrants. After the victim had acknowledged that the warrants did not include any information about Ray shooting at his vehicle, counsel asked the victim to confirm that it was his signature at the bottom of warrant "number 36287." The trial court interrupted, seeking clarification on the number, and stating, "I was looking in the file and for some reason that particular warrant is not in this file and if it's a copy it may or may not be the correct warrant." The trial court also said that "maybe those aren't the applicable warrants, I don't know." Defense counsel explained that some confusion could have resulted because the case had come up and been dismissed on several different occasions before finally being put back on the docket for that day's trial. Counsel then continued with cross-examination, obtaining the victim's acknowledgment that it was his signature on the warrant. When counsel moved to have the document admitted into evidence, the trial court made the following comment: "Well, there might be an issue of relevance here. I don't know why that one apparently has disappeared, it's just not in this file, and maybe it was an original session warrants that for some reason didn't get put in this case, but it's – I have some question."

Nonetheless, when the State announced that it had no objection, the trial court admitted the document into evidence. After admitting the second warrant into evidence as well, the trial court asked counsel to approach the bench, stating that "this is troubling me." The conversation that followed, in which the trial court questioned counsel further about the confusion with the warrants, occurred at the bench, and the trial court made no further comments on the subject in the hearing of the jury. We find nothing in the trial court's comments that can be construed as a suggestion to the jury that defense counsel was behaving improperly. Nor did the trial court's comments give any suggestion that it was favoring the prosecution over the defense. See State v. Caughron, 855 S.W.2d 526, 536 (Tenn. 1993) (stating that a trial judge should be careful not to express any thought that might lead the jury to infer that the judge favors one or the other side in a criminal case) (citing Brooks v. State, 213 S.W.2d 7, 10 (Tenn. 1948)).

The instruction on how to prove damages occurred in the context of the trial court's having sustained a number of objections raised by defense counsel to both the form of the prosecutor's

questions and the nonresponsive answers given by the victim.[3]  During the jury-out hearing that followed, the trial court did not, as Ray claims, exhibit partiality by attempting to help the State prove its case.  Instead, the court told the prosecutor that he could ask the victim if he knew the fair market value of the vehicle before and after the damage occurred, and, if he did not, the State would be relegated to proving misdemeanor, rather than felony, vandalism.  During the extended arguments on this matter, counsel objected to the trial court's suggesting how the State might prove the amount of damages, while recognizing "what the Court's doing in trying to move this case along."  We agree that this was the trial court's intention.

We also find no merit in Ray's assertion that the trial court exhibited partiality by refusing to allow defense counsel to cross-examine the victim on his criminal history, or by failing to inform the jury that the victim acted improperly in talking with the jurors.  First, we note that it was counsel for the codefendant who sought to question the victim about his conviction.  The record reflects that counsel for the codefendant sought, in connection with questioning the victim about his ownership of the gun, to bring up evidence of his status as a convicted felon.  During a jury-out proffer of proof, the forty-six-year-old victim testified that the crime resulting in his status as a convicted felon occurred when he was 19 years old.  The trial court refused to admit the evidence of the victim's criminal history, concluding that it had almost no probative value and was very prejudicial.  We find no bias on the part of the trial judge in this ruling.  We also find nothing inappropriate in the trial court's instruction to the jury regarding the dismissal of Juror Lowery:

> Ladies and gentlemen, you notice that Mr. Lowery is no longer with us.  The reason for that is that he had conversations with [the victim], and given that conversations as innocuous as they may or may not have been, we didn't – we couldn't let him stay on the jury.
>
> Let me ask this question of the remainder of you, have any of you had any communication with [the victim] in any way during these [sic] last break or two, even if it's just to say hello or goodbye, did anybody else on the jury talk with this man at all?  Anybody?
>
> Anybody see anybody else?
>
> Okay.  I'm taking you at your word.  I think you have not had contact, we're going to proceed on.

We respectfully disagree with the defendant's assertion that the trial court denied the motion to dismiss the charges with prejudice because of the concern that "these defendants might escape

---

[3] The prosecutor initially asked the victim if he knew the amount of damage caused to his vehicle.  Defense counsel objected to the form of the question, and the trial court sustained the objection, telling the prosecutor that the proper method was to show the fair market value of the vehicle before and after the damage.

punishment," or that the "court had made up its mind that something had happened and it was going to let the jury decide it." The record supports neither of these claims nor that the trial court, by certain of its rulings, violated the defendant's right to due process.

### III. Sufficiency of the Evidence

As his third issue, Ray challenges the sufficiency of the evidence in support of his vandalism conviction, arguing that the proof that he caused damage to the victim's vehicle was insufficient. Ray first suggests that the victim's testimony regarding the damage to his vehicle was not credible, asserting that "[t]he only evidence submitted by the State to support the charge of vandalism that does not involve a weighing of the testimony of the victim or placing any judgment on his credibility are the photographs of the victim's vehicle," which, he claims, "fail[] to disclose any damage to the windshield consistent with that which would occur from a ball bat." Ray concedes the photographs reveal damage to the driver's side door of the vehicle, but he argues there was no evidence that he either "caused or contributed" to that condition.

When the sufficiency of the convicting evidence is raised as an issue on appeal, we apply the familiar rule that the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted

defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Tennessee's vandalism statute provides in pertinent part that "[a]ny person who knowingly causes damage to or the destruction of any real or personal property of another . . . knowing that the person does not have the owner's effective consent is guilty of an offense under this section." Tenn. Code Ann. § 39-14-408(a) (1997). "'Damage,'" for the purposes of the statute, "includes, but is not limited to: (A) [d]estroying . . . property; or (B) [t]ampering with property and causing pecuniary loss or substantial inconvenience to the owner[.]" Id. § 39-14-408(b)(1)(A)-(B). The statute further provides that "[a]cts of vandalism are to be valued according to the provisions of § 39-11-106 (a)(36) and punished as theft under § 39-14-105." Id. § 39-14-408(c)(1). Tennessee Code Annotated section 39-11-106(a)(36)(A)(i) defines "value" as "[t]he fair market value of the property . . . at the time and place of the offense[.]" Under Tennessee Code Annotated section 39-14-105, the value of any vandalized property will determine the grade of the offense.

Baisden testified that he did not see Ray beat the victim's vehicle, and that he did not see him with anything in his hand when he lunged for the victim's gun. The victim, on the other hand, testified that Ray was armed with a short club, and that he participated with Pryor in "beating all over the truck [the victim's Blazer]." The credibility of witnesses and the weight to be accorded their testimony is accorded to the jury as the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Photographs of the vehicle show a number of dents and scratches all around the vehicle, including the driver's side door. Viewed in the light most favorable to the State, the evidence in this case was sufficient to prove that Ray (1) knowingly caused damage to the victim's vehicle and (2) knew he did not have the victim's effective consent to do so. We, therefore, conclude that the evidence was sufficient to support Ray's misdemeanor vandalism conviction.

## IV. Defective Indictment

As his final issue, Ray contends that count one of his indictment was fatally defective because it omitted the words "State of" in the phrase "against the peace and dignity of the State of Tennessee." The State responds by arguing that the indictment met the constitutional and statutory requirements of providing notice to the accused and was not rendered void by virtue of the omitted language. We agree with the State.

An indictment must inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In addition, Tennessee Code Annotated section 40-13-202 requires that an indictment

> state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment.

-10-

An indictment that achieves its "overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000). Our supreme court has held that an indictment is sufficient to satisfy notice requirements if it "contains allegations that (1) enable the accused to know the accusation to which answer is required; (2) furnish the trial court an adequate basis for entry of a proper judgment; and (3) protect the accused from a subsequent prosecution for the same offense." Id. at 299 (citing State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997)).

The indictment in this case was clearly sufficient to satisfy the overriding purpose of notice to the accused. Count one of the indictment charged the following:

> **RANDY RAY** and **BOBBY PRYOR** on the 8th day of November, 1999 in Marion County, Tennessee, and before the finding of this Indictment, did unlawfully and knowingly make an assault upon the person of one **Randy Hutchins**, and did cause the said **Randy Hutchins** to reasonably fear imminent bodily injury, said assault being accomplished by the use of a deadly weapon, to wit: **gun, vehicle and bat,** in violation of **T.C.A. 39-13-102,** all of which is against the peace and dignity of Tennessee.

Ray argues that the omission of the words "state of" is sufficient to render count one of the indictment fatally void. We respectfully disagree. In Hill, our supreme court, emphasizing that an indictment need not conform to strict pleading requirements, explained that an analysis of the sufficiency of an indictment should be approached "'from the broad and enlightened standpoint of common sense and right reason rather than from the narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding.'" Hill, 954 S.W.2d at 728 (quoting United States v. Purvis, 580 F.2d 853, 857 (5th Cir. 1978)). Although count one of the indictment failed to include the words "state of," it nonetheless put the defendant on notice that he was charged with aggravated assault accomplished with the use of a deadly weapon, including the specific deadly weapons alleged to have been used. It also named a specific victim and a specific date for the offense, and it referenced the statute that he was charged with violating. The indictment additionally alleged that the offense occurred in Marion County, Tennessee. "So long as an indictment performs its essential constitutional and statutory purposes, a defect or omission in the language of the indictment will not render the judgment void." Hart v. State, 21 S.W.3d 901, 903 (Tenn. 2000) (citing Dykes v. Compton, 978 S.W.2d 528, 529 (Tenn. 1998)). This issue, therefore, is without merit.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE